## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

UBS FINANCIAL SERVICES INC.,

        Plaintiff,

v.

SEAN FETTERMAN,
ADAM FETTERMAN,
DAVID RAPHAN,
BRANDON FETTERMAN,
LETICIA BUCKLEY, and
DEBORAH UMPHREY

        Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff UBS Financial Services Inc. ("UBS") as for its Complaint against Defendants Sean Fetterman, Adam Fetterman, David Raphan, Brandon P. Fetterman, Leticia Buckley, and Deborah Umphrey (collectively "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.    Prior to their sudden resignation *en masse* from UBS last Friday, December 4, 2020, Defendants comprised a high-profile team of UBS financial advisors in the firm's Boca Raton, Florida office that collectively managed approximately $1.79 billion in client assets generating over $14 million in annual revenue to UBS (the "Fetterman Team"). Defendant Sean Fetterman ("Sean") was the marquee leader of the Fetterman Team who alone was responsible for over $9 million in annual revenue to the firm.

2.      In 2018, UBS invited Sean to participate in a highly selective program for its top financial advisors, the Aspiring Legacy Financial Advisor ("ALFA") Premier Plus program, which allows select financial advisors to transition their client relationships to other UBS advisors in exchange for lucrative monetary payments over time.

3.      On July 23, 2018, Sean signed an ALFA Premier Plus Commitment Agreement pursuant to which he agreed to enter and complete the firm's ALFA Program at date certain in the future. In exchange for that commitment, UBS agreed to make an immediate payment to Sean of $7,051,695 in the form of a loan, plus annual cash transition payments equal to the annual installment payments due under the loan, plus interest (the "ALFA Premier Payment").

4.      The ALFA Premier Payment was also subject to Sean's express agreement to certain post-employment restrictive covenants, including a non-competition covenant and a one year non-solicitation of UBS clients. Sean knowingly and willingly entered into this lucrative arrangement and executed formal written agreements, which he had reviewed by his personal counsel and which he understood committed him to transferring his client relationships to other UBS financial advisors and prohibited him from soliciting UBS clients in the event that his employment terminated.

5.      Less than two and one-half years later, Sean decided to resign his employment and renege on his contractual commitments in favor of an even better deal offered by Morgan Stanley. Upon information and belief, his eye-popping transition deal with Morgan Stanley will ultimately pay him more than $25 million. He took with him five colleagues, all of whom resigned simultaneously on December 4, using identical resignation notices that referred UBS to an attorney they had already engaged. Remarkably, Sean's resignation occurred just days after

UBS had just completed a bespoke renovation and build-out of his team's office suite that cost the firm in excess of $100,000.

6.      In the weeks leading up to their resignation, moreover, Defendants printed thousands of pages of documents containing highly confidential UBS client information, containing among other things, individual client contact information, account numbers, holdings, account activity, cost basis and tax-related information as well as proprietary fee and interest rate information. The timing and volume of printing, coupled with the nature of the documents printed, strongly suggest they were printed and unlawfully taken by Defendants to be used for the purpose of pirating UBS client accounts and seamlessly replicating key UBS account features and offerings at Morgan Stanley, rather than for any legitimate UBS business purpose.  UBS has been unable to locate the documents in the Boca Raton branch.

7.      Five of the six departing Defendants had signed agreements containing non-solicitation covenants. And, all six departing Defendants signed agreements containing confidentiality covenants. But that did not stop them from soliciting UBS clients and unfairly competing with UBS armed with the thousands of pages of confidential information they misappropriated from UBS in the lead up to their resignations.

8.      Instead, they immediately and impermissibly started soliciting UBS's clients in a malicious effort to seize some or all of the $1.79 billion in managed assets UBS helped them develop over a twelve year period. By close of business on Monday December 7, UBS had received electronic instructions to transfer over $250 million in client assets held by Fetterman Team clients at UBS to Morgan Stanley.  Client assets continue to flow out of UBS to Morgan Stanley on an ongoing basis every day.

9.      By their actions, each Defendant has breached his or her contractual obligations and fiduciary duties.

10.     By those same actions, each Defendant has engaged in tortious and malicious conduct.

11.     UBS brings this action to enforce Defendants' contractual promises, protect its customers, goodwill, and confidential information, and prevent irreparable injury to its business.[1]

12.     Defendants' blatant and unabated disregard for their contractual obligations and fiduciary duties have caused and are continuing to cause irreparable harm to UBS such that immediate injunctive relief is necessary and warranted.

## PARTIES

13.     UBS is a Delaware corporation with its principal place of business in the State of New York. UBS is a securities broker-dealer and commodities futures commission merchant throughout the United States and a FINRA member firm.

14.     Until recently, Defendants were UBS employees.

15.     Sean began his employment with UBS on May 19, 2008, and worked as a financial advisor in the Boca Raton office until he resigned from his employment on December 4, 2020.

16.     Adam Fetterman ("Adam") began his employment with UBS on May 19, 2008, and worked as a financial advisor in the Boca Raton office until he resigned from his employment on December 4, 2020.

---

1 As required by securities industry rules, UBS is simultaneously filing an arbitration claim for permanent injunctive relief and damages against Defendants at FINRA Dispute Resolution.

17.     David Raphan ("Raphan") began his employment with UBS on May 19, 2008, and worked as a financial advisor in the Boca Raton office until he resigned from his employment on December 4, 2020.

18.     Brandon Fetterman ("Brandon") began his employment with UBS May 2017, and worked as a financial advisor in the Boca Raton office until he resigned from his employment on December 4, 2020.

19.     Leticia Buckley ("Buckley") was team administrator for the Fetterman & Fetterman Wealth Management Group in UBS's Boca Raton office. She began her employment with UBS in 2000, and held a variety of roles before she resigned from her employment on December 4, 2020.

20.     Deborah Umphrey ("Umphrey") was employed by UBS as a client service associate for the Fetterman & Fetterman Wealth Management Group in the Boca Raton office. She began her employment with UBS in 2005 and resigned her employment on December 4, 2020.

21.     Each Defendant resides in Florida.

**JURISDICTION AND VENUE**

22.     The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because each Defendant resides in this judicial district, and because a substantial part of the events giving rise to UBS's claims occurred in this judicial district.

24.     The merits of this dispute are subject to mandatory arbitration before the Financial Industry Regulatory Authority ("FINRA").  However, under Rule 13804 of the FINRA Code of

Arbitration Procedure, UBS is exercising its right to seek preliminary injunctive relief in this Court.  In compliance with the FINRA Code, UBS has simultaneously filed a Statement of Claim with FINRA against Defendants and their new employer, Morgan Stanley.

### DEFENDANTS' FORMER UBS EMPLOYMENT

25.     The Defendants' worked together as a financial advisor team, known as the Fetterman & Fetterman Wealth Management Group.

26.     Defendants were a highly successful team at UBS. At the time of their resignation, Defendants were responsible for managing $1.79 billion in assets for UBS clients. Defendants generated approximately $14.3 million in revenue for UBS in the twelve months prior to their resignation.

***Sean Fetterman's Former UBS Employment and Agreements***

27.      Sean worked as a financial advisor in the Boca Raton office.  UBS business records reflect that Sean began his employment with UBS on May 19, 2008.

28.     Sean was a highly successful and productive financial advisor at UBS. At the time of his resignation, he was credited with managing approximately $1.25 billion in assets for UBS clients and had generated just over $9.5 million in revenue in the preceding twelve months.

29.     Due to his success at UBS (among other factors), Sean was invited to participate in a highly selective program at UBS known as Premier Plus for the Aspiring Legacy Financial Advisor ("ALFA") Program.

30.     The standard ALFA program offers eligible UBS financial advisors who plan on leaving the industry the opportunity to transition their client relationships to other UBS financial advisors. Under ALFA, the so-called "Legacy FA" transitions accounts to "Receiving FAs" and then receives monthly payments for a five-year transition period.

31.     ALFA Premier Plus is prelude to the ALFA program that is made available to certain select UBS financial advisors. Under ALFA Premier Plus, the financial advisor enters into a written commitment to enter and complete the ALFA program. In exchange for this written commitment, the ALFA Premier Plus financial advisor receives an upfront payment in the form of a loan, plus annual cash transition payments equal to the annual installment payments due under the loan, plus interest.

32.     In 2018, Sean accepted UBS's invitation to participate in ALFA Premier Plus. On July 23, 2018, he signed a Premier Plus Commitment Agreement under which he agreed he would enter into the ALFA program in July 2028.

33.     In exchange for executing the Premier Plus Commitment Agreement, Sean received a loan from UBS in August 2018 in the amount of $7,051,695 and signed a promissory note promising to repay that amount in annual installments over a period of 13 years.

34.     Sean was also eligible to receive annual cash transition payments equal to the annual installment payments due under the loan, plus interest, and thus entered into a Premier Plus Transition Payment Award Agreement, dated July 1, 2018. The Premier Plus Transition Payment Award Agreement specified that he would be entitled to receive annual cash transition payments in the total amount of more than $7 million.

35.     The Premier Plus Transition Payment Award Agreement also contained non-competition, non-solicitation and confidentiality provisions. Specifically, the Premier Plus Transition Award Agreement provides as follows at Paragraph 14:

> 14.B. Non-Solicitation: Employee … agrees that during the Restricted Period Employee will not directly or indirectly solicit or interfere with … any of the clients or client relationships of any UBS Group entity that Employee either performed work for, supervised or actively solicited work from during the 12 months prior to the date on which Employee's employment terminates or

whose name became known to Employee during Employee's employment. Employee's agreement 'not to solicit' includes but is not limited to Employee's agreement not to initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client to transfer any account from the UBS Group to Employee or any other entity or person; to open a new account with Employee or any other entity or person; or to discontinue the client's business relationship with the UBS Group.

14.C (i) "Restricted Period" means the period during which employee is employed by UBSFS until one year from the last to occur of the following: (i) the date on which Employee's employment terminates with UBSFS for any reason whatsoever and (ii) the scheduled Inactive Phase End Date as defined in Employee's Premier Plus Commitment Agreement.

*See* **Exhibit A (**Premier Plus Transition Payment Award Agreement).

36.     The Premier Plus Transition Payment Award Agreement also prohibits Sean from using, disclosing or taking UBS confidential information, including "client lists and contact information," except in connection with his duties as a UBS employee.

37.     The Premier Plus Transition Payment Award Agreement has a New York choice of law provision.

38.     Sean also signed numerous other agreements with UBS in which he agreed not to solicit UBS clients upon his termination from UBS and to preserve the confidentiality of UBS client information.

***Adam Fetterman's Former UBS Employment and Agreements***

39.     Adam began his employment with UBS on May 19, 2008, and worked as a financial advisor in the Boca Raton office.

40.     During the course of Adam's UBS employment, he executed multiple agreements concerning the non-solicitation of UBS clients and the confidentiality of UBS client information,

including a Deferred Cash Award Agreement he signed on February 21, 2017, which provides in

pertinent part:

> 7. Non-Solicitation Of Clients: Subject to applicable law and Paragraph 8 of this Agreement, in the event Employee's employment with [UBS] is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from the date of termination or until such time that all amounts owed by the Employee to [UBS] and all related entities have been fully repaid, whichever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at [UBS] ("Clients of [UBS]") whom Employee serviced during his/her employment at [UBS] or other Clients of [UBS] whose names became known to Employee while in the employ of [UBS].
>
> "Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:
>
> (a) to transfer his/her [UBS] account(s) to the Employee or his/her new employer; or
> (b) to open a new account with Employee or his/her new employer; or
> (c) to otherwise discontinue his/her existing business relationship with [UBS].
>
> 8. Confidentiality Of Client Information: All information concerning Clients of [UBS], former clients of [UBS] and prospective clients of [UBS] must be treated as confidential and must not be disclosed to anyone outside [UBS] unless the disclosure is expressly authorized by the client, required by law, rule, regulation or legal process. Employee further expressly agrees that, in the event Employee's employment is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee may not take any records or information referring or relating to Clients of [UBS], former clients of [UBS] and prospective clients of [UBS], whether originals or copies, in hard copy or computerized form.

*See* **Exhibit B (**February 21, 2017 Deferred Cash Award Agreement).

41.     The February 21, 2017 Deferred Cash Award Agreement has a New Jersey choice of law provision.

***David Raphan's Former UBS Employment and Agreements***

42.     Raphan began his employment with UBS on May 19, 2008, and worked as a financial advisor in the Boca Raton office.

43.     During the course of Raphan's UBS employment, he executed multiple agreements concerning the non-solicitation of UBS clients and the confidentiality of UBS client information, including an Agreement for New Financial Advisors in the Development Program ("NFA Agreement") he signed on June 4, 2008, which provided in pertinent part:

> 2.   Non-Solicitation Covenants
>
> 2.1 In the event of Employee's termination from [UBS] for any reason whatsoever, whether voluntary or involuntary, Employee agrees that he/she:
>
> (i)     Will not solicit, directly or indirectly, for a period of six months from the date of termination of Employee's employment, any of the clients who maintain accounts at [UBS] ("Clients of [UBS]") whom Employee serviced during his or her employment at [UBS] or other Clients of [UBS] whose names became known to Employee while in the employ of [UBS]; and,
>
> (ii)    For a period of six months following termination of employment for any reason, Employee will not, directly or indirectly, recruit or solicit any employee of [UBS] for employment with, or as a consultant or to provide services of any kind to, any other organization which engages in any line of business in which [UBS] or any of its affiliates is engaged; and
>
> (iii)   Will return any and all original, copied and computerized Restricted Information or Company Records, in whatever form they may exist.
>
> 2.2 "Solicit" as used in paragraph 2.1(a) means that the Employee will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of

inviting, encouraging or requesting a client, or that may have the effect of inviting, encouraging or requesting a client:

(a)    To transfer his or her [UBS] account(s) to the Employee or his or her new employer; or

(b)    To open a new account with Employee or his or her new employer; or

(c)    To otherwise discontinue its existing business relationship with [UBS].

Without limiting the generality of the foregoing, [UBS] and Employee specifically and further agree that the term "solicit" as used in Paragraph 2.1(i) includes any mailing or other communication that is sent directly to one or more of the Clients of [UBS] whom Employee serviced during his or her employment at [UBS] or other Clients of [UBS] whose names became known to Employee while in the employment of [UBS].

*See* **Exhibit C** (NFA Agreement).

44.    In the NFA Agreement, Raphan further agreed to maintain the confidentiality of UBS's client information and acknowledged that he would not be permitted to retain, disclose, or utilize any of UBS's confidential client information or other proprietary information after the termination of his employment.

45.    The NFA Agreement has a New Jersey choice of law provision.

***Brandon Fetterman's Former UBS Employment and Agreements***

46.    Brandon began his employment with UBS in May 2017. He held several different positions with the company and ultimately became a financial advisor in the Boca Raton office.

47.    During the course of Brandon's UBS employment, he executed multiple agreements concerning the non-solicitation of UBS clients and the confidentiality of UBS client information, including an agreement he signed on June 27, 2019 regarding his employment in the UBS Wealth Manager Development Program, which provided in relevant part:

**Non-Solicitation**

You agree that during your employment, and for a period of twelve months from the termination date of your employment for whatever reason, you may not directly or indirectly for yourself or for any third party solicit, influence, induce, recruit or cause any employee of any UBS Group entity with whom you worked or supervised to terminate his or her employment with the UBS Group for the purpose of joining, associating or becoming employed with any business wherever located, with which or of which you are or anticipate becoming an employee, owner, partner, investor, member, agent, director, consultant, independent contractor or otherwise associated in any way whatsoever. As a condition of the UBS Group providing you with access to Confidential Information and the benefits of the Program, including but not limited to Program training, you further agree that during your employment, and for a period of twelve months from the termination date of your employment for whatever reason, you will not directly or indirectly solicit any of the clients or client relationships of any UBS Group entity that you either performed work for, supervised or actively solicited work from during the twelve months prior to the termination of your employment or whose name became known to you during your employment. "Solicit" as set forth in this Paragraph means that the you will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client to transfer any account from the UBS Group to you or your new employer, to open a new account with you or your new employer, or to discontinue its business relationship with the UBS Group.

***

## Protection of Confidential Information

You may not directly or indirectly use, maintain, take or disclose any Confidential Information, except (i) in the course of carrying out your duties for the Firm during your employment, or (ii) as otherwise required by law or governmental agency with jurisdiction, or (iii) as otherwise permitted by this letter. "Confidential Information" as used herein includes but is not limited to any nonpublic information concerning UBS Group, its financial data, strategic business plans, products and product development, services, client relationships and prospective client relationships, client lists and contact information, client information (including but not limited to clients' past and present

financial conditions, investment practices, preferences, activities, objectives and plans and other client data you obtain while in the Firm's employ), marketing plans, and any other trade secrets or confidential or proprietary information. You further expressly agree that, in the event your employment terminates, your use of Confidential Information, including but not limited to any information referring or relating to clients of UBS, former clients of UBS and prospective clients of UBS, must immediately cease and that you must immediately return, destroy or delete, any Confidential Information whether in hard copy or computerized form, including in any electronic device you own.

*See* **Exhibit D** (June 27, 2019 UBS Wealth Manager Development Program agreement).

48.     The June 27, 2019 UBS Wealth Manager Development Program agreement has a New York choice of law provision.

***Leticia Buckley's Former UBS Employment and Agreements***

49.     Buckley was employed by UBS as a team administrator for the Fetterman & Fetterman Wealth Management Group in the Boca Raton office. She began her employment with UBS in 2000, and held a variety of different roles until her resignation.

50.     During the course of Buckley's UBS employment, she executed multiple agreements concerning the non-solicitation of UBS clients and the confidentiality of UBS client information, including a transfer agreement she signed on January 17, 2019, which provided:

You further agree that during your employment, and for a period of twelve months from the termination date of your employment for whatever reason, you will not directly or indirectly solicit any of the clients or client relationships of any UBS Group entity that you either performed work for, supervised or actively solicited work from during the twelve months prior to the termination of your employment or whose name became known to you during your employment. Your agreement 'not to solicit' includes but is not limited to your agreement not to ask such UBS Group clients to transfer any account from the UBS Group to you or your new employer; to open a new account with you or your new employer; or to discontinue its business relationship with the UBS Group.

*See* **Exhibit E** (January 17, 2019 transfer agreement).

51.     The January 17, 2019 transfer agreement has a New Jersey choice of law provision.

***Deborah Umphrey's Former UBS Employment and Agreements***

52.     Umphrey was employed by UBS as a client service associate for the Fetterman & Fetterman Wealth Management Group in the Boca Raton office. She began her employment with UBS in 2005.

53.     During the course of Umphrey's UBS employment, she repeatedly agreed that she would use UBS's confidential information, including information regarding UBS clients, only in connection with her UBS duties and that her use of such information would cease upon the termination of her employment. One such agreement she executed was the Agreement Relating to Intellectual Property and Confidential Information she signed on December 19, 2005, which provided as follows:

> 4. UBS Financial Services Inc.'s Confidential Information: During the period of my employment and subsequent thereto, I will keep in confidence and will not, except as required in the conduct or UBS Financial Services Inc.'s business or as authorized in writing by UBS Financial Services Inc.'s intellectual property counsel, publish, disclose or use. or authorize anyone to publish, disclose, or use, any non-public information I may in any way acquire, learn, develop, or create by reason of my employment by UBS Financial Services Inc., which gives UBS Financial Services Inc. an opportunity to obtain an advantage over competitors who do not know or use it. This includes, for example, customer lists, marketing plans, financial data, business data, computer software, etc. ("Confidential Information") unless the specific item of UBS Financial Services Inc.'s Confidential Information: (a) was known to me prior to its receipt as evidenced by written records, (b) is now in, or hereafter (through no breach of this agreement) becomes general public knowledge, or (c) prior to my disclosure, dissemination or use, was lawfully acquired by mc without any obligation to retain the information in confidence.

*See* **Exhibit F** (December 19, 2005 Agreement Relating to Intellectual Property and Confidential Information).

54.     The December 19, 2005 Agreement Relating to Intellectual Property and Confidential Information has a New York choice of law provision.

***UBS Policies Regarding Confidentiality of Information***

55.     As UBS financial advisors and supporting staff members, Defendants had access to confidential UBS information relating to, among other things, client names and contact information, client investment information and  account performance reporting, client financial data, and client estate planning information, to name a few.

56.     Throughout their UBS employment, Defendants repeatedly acknowledged the confidentiality of information concerning UBS's clients. Each advisor was provided, and was required to read and comply with all firm policies and procedures, including UBS's Code of Conduct and Investment Advisor Code of Ethics ("the Code of Conduct").

57.     A financial advisor's agreement to comply with UBS's policies and procedures, including the Code of Conduct and other policies designed to ensure the confidentiality and security of UBS's confidential client and business information, is a condition of his or her continued employment with UBS. The Code of Conduct section entitled "Privacy/Confidential Client, Employee and Firm Information" states, in relevant part, as follows:

> A.     Introduction
>
> It is essential for all employees to maintain and preserve the confidentiality of the Firm's and its clients' information. This obligation continues even after an employee leaves the Firm. The policies and procedures set forth below set a minimum standard; your business unit or position may require additional, and in some instances more restrictive, procedures.
>
> Firm or client information generally may only be used for the specific purpose for which it was created or obtained; any other

use without the permission of the source may be a misuse. Your ability to share Firm or client information within and outside the Firm is governed by both Firm and departmental policies and procedures, and by Federal and State regulations. Generally, you may only disclose such information with the Firm to employees who have a need to know it to carry out the Firm's business and sharing with affiliates or unaffiliated third parties is strictly limited. Under no circumstances may you disclose Firm or client information to anyone should it appear likely he or she would misuse the information.

Confidential information may be contained in Firm documents, computer programs, databases, client lists, trading strategies and analytic models. You should assume that all nonpublic or unpublished information is confidential.

Upon the termination of your [UBS] employment, you may not retain or take with you any Firm property or assets, including any writings, files, documents or other records that contain client information, including information maintained electronically, such as disks, e-mail, computer databases, video, microfiche and tape recordings, or any other Firm confidential information.

Each Firm employee acknowledges that if he or she violates any aspect of this section, the Firm will suffer immediate and irreparable harm for which monetary damages would provide only partial inadequate relief. Each Firm employee agrees that he or she may be subject to an injunction or other equitable remedy in the event that he or she violates the provisions of the UBS Financial Services Inc. Code of Conduct pertaining to confidential Firm and client information.

B.       Client Information and Privacy

Our clients, both individual and institutional, entrust us not only with their financial assets but also with confidential information. It is essential that the Firm's clients know that personal information they entrust to us will be handled with integrity and discretion. Accordingly, all information concerning Firm clients, former clients and prospective clients must be treated as confidential and must not be disclosed to anyone outside the Firm unless the disclosure is expressly authorized by the client; required by law, rule, regulation or legal process; or specifically allowed by the Firm's privacy policies.

*See* **Exhibit G** (UBS's Code of Conduct).

58.     In addition, Defendants were required to annually certify to UBS that they fully complied with and adhered to firm policies, including those contained in the Firm's Code of Conduct and Business Ethics and all other applicable firm policy manuals, Compliance Bulletins, Guidelines, and Directives; as well as the laws, rules, and regulations that govern or are otherwise applicable to the financial services industry.

***Further Efforts Taken by UBS to Safeguard the Confidentiality of UBS Records and Client Information***

59.     Each UBS financial advisor's access to information concerning UBS clients is limited to those clients whose accounts are serviced by that financial advisor. In order to gain access to client information through UBS's computer system, each financial advisor must use his or her confidential password. The system is designed so that one financial advisor cannot gain access to information concerning clients serviced by other financial advisors without having access to their computer password (unless special clearance has been given, and the necessary arrangements are made).

60.     UBS management personally reviews outgoing correspondence from the employees in the office in order to determine (among other things) that no confidential or proprietary information is improperly disclosed outside of UBS.

61.     UBS's customer base is the lifeblood of its business. UBS spends millions of dollars each year on national and local advertising.  UBS also spends millions of dollars more each year for: (a) sales support staff; (b) clearing services, operations personnel, systems, and support; (c) management and compliance supervision; (d) salaries; (e) annual registration fees; (f) computer services and equipment, phone systems, and mail handling facilities; (g) securities research and the publication of literature concerning securities and investments; (h) investment seminars and promotional events; (i) subscriptions to trade, professional and news publications;

and (j) the retention of experts in tax, employee, and health benefits, insurance, real estate, underwriting, and numerous other sub-specialties.  UBS incurs these many and substantial expenditures for the specific purpose of attracting and maintaining a loyal client base, and in order to establish and maintain customer goodwill.

***Defendants Print Thousands of Pages of Confidential Information Prior to Resigning***

62.  In the lead up to their coordinated resignations, Defendants printed thousands of pages of documents containing UBS's confidential information.

63.  For example, Buckley printed, in mid-August 2020, a 139-page client list with client names, addresses, and phone numbers.

64.  There was no business reason to print the client list. The information in the list is accessible in a proprietary database to which that all Defendants had regular access, and a simple database query is far easier than flipping through 139 physical pages to locate a client.

65.  In early November, Brandon directed a member of his administrative team who was working remotely to generate and print a client label list on a printer in the Boca Raton office, where Brandon was regularly working. Brandon told her that he needed her to print a label list so Defendants could send holiday gifts to clients from UBS.

66.  The list was 38 pages long and contained the names, addresses and phone numbers for approximately 1,000 team clients and prospects.

67.  The administrative team member who received Brandon's request reported that it was odd to receive a request for holiday list so far in advance of the holidays, but she complied with the request nevertheless.

68.  As of their resignations Defendants had actually sent out holiday gifts only to a very small handful of the large list that the administrative team member had compiled for them.

69.     Between November 17, 2020 and December 4, 2020, the day they resigned *en masse*, Defendants printed 130 individual "client windows" screens, which include detailed and highly-sensitive client information such as contact information, UBS account numbers, account values, client investment objectives and risk tolerances and a snapshot of the client's UBS account, including individual holdings, investment activity, gain/loss information and cost basis information

70.     There was no discernible business reason to print 130 separate client windows in the days leading up to their resignation, particularly since Defendants had convenient electronic access to these windows on the UBS systems.

71.     In the months and days before their abrupt departure, Defendants also printed spreadsheets numerous other spreadsheets and reports containing client information, prospect information and UBS account fee and billing information.

72.     For example, on December 1, 2020, two days before resigning, Buckley printed a number of documents, including separate reports containing detailed information on: (i) individual client securities-backed loans/credit lines containing client account numbers, credit balances and interest rates; and (ii) UBS advisory (fee-based) accounts containing individual client account numbers, investment manager information and the UBS fees charged in each account. There would be no discernible business reason to print these reports.

73.     Client-specific information about securities-backed loans, interest rates and fees charged in advisory accounts would be highly valuable to Defendants because it would enable them to seamlessly replicate key client account features at Morgan Stanley.

74.     Defendants printed 770 separate documents in the final two weeks of their employment with UBS (between November 19 and December 4), amounting to 3,668 pages.

75.     Since Financial Advisors were not taking in-person client meetings between November 19 and December 4, and were not presenting physical packets to clients and potential clients, there was no business reason to print 3,668 pages of UBS confidential and proprietary information.

***Defendants Simultaneously Resign from the UBS Boca Raton Branch and Immediately Begin Soliciting UBS Clients and Utilizing UBS Confidential Information***

76.     On Friday, December 4, 2020, at approximately 1:35 p.m., each Defendant abruptly and simultaneously resigned from UBS, by email without providing any prior notice. All were members of the same financial advisory team, led by Sean, which collectively managed approximately $1.79 billion in client assets that generated approximately $14.3 million in annual revenue.

77.     Each Defendant sent UBS Branch Manager Michael Ludwig ("Ludwig") and UBS Associate Director and Administrative Manager Marc Lundgren ("Lundgren"), identical resignation notices by email, which stated in part that they were resigning immediately and moving to Morgan Stanley, a direct competitor of UBS.

78.     That same day, December 4, 2020, the Defendants all became employed by Morgan Stanley.

79.     Upon information and belief, Defendants have received a transition deal from Morgan Stanley under which they will be paid in the range of $35-40 million total, including an initial payment to the team in excess of $20 million. Sean individually will receive, upon information and belief, more than $25 million over the life of the deal.

80.     As discussed above, five of the six Defendants were subject to written agreements at the time of their separations from UBS prohibiting them from (a) soliciting clients and

(b) possessing, disclosing, or using any confidential UBS client information. The sixth Defendant, Umphrey, was subject to a confidentiality agreement.

81.     Notwithstanding these obligations, Defendants immediately began contacting the UBS clients they had serviced to solicit them on behalf of Morgan Stanley.

82.     Upon information and belief, Defendants have used confidential UBS customer information to facilitate their communications with clients in person and by cell phone calls, texts, and emails.

83.     Several clients that Defendants serviced while at UBS have already started to move their business to Morgan Stanley and have notified UBS that they already have been contacted by Sean, Adam, Raphan, Brandon, Buckley and their team at Morgan Stanley.

84.     Immediately following Defendants' resignations, the Boca Raton management team, including Lundgren, Ludwig, Assistant South Florida Market Head Julene Richards and Market Head Bob Covino, scrambled to reassign the investment accounts of approximately 468 clients (many of whom maintain multiple accounts at UBS) formerly serviced by Defendants to other UBS financial advisors to retain and manage those accounts.

85.     The process of reassigning clients to new Financial Advisors at the branch is labor intensive. While part of that process involved an automated tool that reassigned accounts randomly to other financial advisors in the Boca Raton office, a number of the client households serviced by  Defendants required special accreditation and/or expertise, which meant UBS had to create a plan for identifying qualified and licensed advisors, matching clients with those advisors and helping the new advisors get up to speed on client risk profile and investment requirements as well as the specific products and services deployed in their portfolios.

86.     The reassignment process continued throughout the weekend following Defendants' resignations and is still not fully completed.

87.     By Monday morning, December 7, 2020, (*i.e.* the first business day after Defendants resigned), UBS had already begun receiving electronic instructions from clients serviced by Defendants to transfer their accounts to Morgan Stanley via the Automated Customer Account Transfer Service system ("ACAT").

88.     In order to initiate an electronic account transfer via the ACAT system, clients must execute written account transfer paperwork authorizing the transfer.

89.     By the end of day on December 7, UBS had received approximately 30 ACAT requests from clients formerly serviced by Defendants to transfer approximately $250 million in UBS client assets to Morgan Stanley.

90.     The volume of ACAT transfer requests received on December 7th -- the first business day after Defendants resigned to join Morgan Stanley -- was unusual and surprising. Generally, UBS does not typically start receiving ACAT transfer requests that quickly following the departure of a financial advisor.

91.     UBS has continued to receive a steady stream of ACAT transfer requests from clients formerly serviced by Defendants.

92.     By the end of the day on Wednesday, December 9, 2020, UBS had received over 100 hundred ACATS from clients serviced by Defendants, accounting for approximately $300 million in UBS client assets.

93.     While ACATS continued to hit the UBS Boca Raton system, the management team was continuing to work on the client reassignments, including opening new UBS accounts, getting the new UBS advisors access to client account information and reporting on the firm's electronic systems.  In many cases, the UBS Boca Raton branch was receiving ACAT transfer

requests before the new UBS advisor even had a chance to review the portfolios and connect with the client.

94.     On the morning of December 7, 2020, Lundgren received a call from a former client, who complained about management fees he had been charged over the past few years. On the call with Lundgren, the client said his mother and sister were also UBS clients, and he used an insider term that most clients are not familiar with: "relationship pricing."

95.     Sean had spoken to the client the previous Friday (*i.e.,* the date Defendants resigned *en masse*). During the call, Sean promised to discount the client's management fees if the client transferred his business to Morgan Stanley.

96.     The following day, the same client called Lundgren back, this time with Adam Fetterman on the line, to tell Lundgren he was moving his business from UBS to Morgan Stanley.

97.     Other similar client interactions occurred on December 7 and 8 that suggested to Lundgren that Defendants were actively soliciting UBS clients.

98.     For example, on Monday December 7, Ludwig spoke with one UBS client who stated that she had been advised by Defendants sometime during the week of November 30 through December 4, 2020, that the team was leaving UBS to join Morgan Stanley. The client further stated that she had already decided to transfer her accounts to Morgan Stanley.

99.     On that same day, Ludwig contacted another client serviced by Defendants whose accounts Ludwig had helped facilitate moving to Defendants from another UBS financial advisor several years ago. That client told Ludwig that Sean contacted him last week about their move to Morgan Stanley and that he had already made the decision to transfer his accounts to Morgan Stanley.

100.     On December 8, 2020, Seth Ripple, a Senior Vice President and Senior Portfolio Manager for UBS, emailed a client formerly serviced by Defendants that he had been reassigned to introduce himself, offer his services, and communicate the firm's offer to reduce certain account fees as an incentive to continue to do business at UBS.

101.     The client responded: "**Sean Fetterman called me Friday** and Leticia called yesterday. I think I am up to speed."

102.     The client submitted an ACAT transfer request later the same day.

103.     In addition, as of December 8, 2020,  an unusual number of UBS clients serviced by the Fetterman Team had recently closed out securities-backed loans ("SBLs") associated with their UBS investment accounts.  The SBLs are effectively credit lines secured by securities in their UBS accounts and it is common knowledge in the securities industry that accounts with open credit lines cannot be transferred via the ACAT system until the credit line is paid down and closed.  The unusual number of SBLs closed out by clients in the weeks and months leading up to their resignation (including SBLs with zero balance) strongly suggests that Fetterman Team was executing the close-outs to make it easier to transfer those accounts to Morgan Stanley.

104.     Of the approximately 40 accounts where there had been a recent payoff of an SBL securities, a number of those clients have already submitted ACATs to transfer those accounts to Morgan Stanley.

### FIRST CLAIM FOR RELIEF
#### (Breach of Contract – Non-Solicitation of Clients – Against Defendants Sean Fetterman, Adam Fetterman, David Raphan, Brandon Fetterman, and  Leticia Buckley)

105.     UBS repeats and realleges each and every allegation contained in Paragraphs 1 through 104 of the Complaint as if fully set forth herein.

106.    Each Agreement containing a non-solicitation covenant signed by Defendants Sean Fetterman, Adam Fetterman, David Raphan, Brandon Fetterman, and Leticia Buckley ("the Soliciting Defendants") is valid and enforceable.

107.    Each Soliciting Defendant violated his or her non-solicitation covenants, the provisions of which are set forth above, by soliciting, servicing and/or otherwise interfering with UBS's relationships with its clients.

108.    All of the Agreements were supported by adequate consideration, as set forth above, and contain reasonable post-employment restrictions that are necessary to protect UBS's legitimate business interests.

109.    UBS fully performed its obligations under the Agreements containing non-solicitation covenants.

110.    As direct and proximate result of the Soliciting Defendants' breaches of their non-solicitation agreements, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  UBS will continue to suffer this harm unless and until the Individual Defendants are restrained from their current conduct and are compelled to abide by the terms of their non-solicitation covenants.

111.    As a direct and proximate result of the Individual Defendants' breach of the Non-Solicitation covenants, UBS has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract – Confidential Information – Against All Defendants)

112.    UBS repeats and realleges each and every allegation contained in Paragraphs 1 through 111 of the Complaint as if fully set forth herein.

113.    Each agreement containing a confidentiality covenant signed by each Defendant is valid and enforceable.

114.    Under the confidentiality covenants, Defendants are prohibited from directly or indirectly using, disseminating or disclosing UBS's Confidential Information, as the term is defined in the agreements set forth above, except as required to carry out their duties as an employee of UBS.

115.    Upon information and belief, each Defendant has used or disclosed, or threatens to use or disclose, UBS's Confidential Information, in violation of his or her Confidentiality covenants.

116.    UBS fully performed its obligations under the Agreements set forth above, which contain confidentiality covenants.

117.    As direct and proximate result of Defendants' breaches of the confidentiality covenants, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. UBS will continue to suffer this harm unless and until Defendants are restrained from their current conduct and are compelled to abide by the terms of the Confidentiality covenants.

118.    As a direct and proximate result of Defendants' breaches of their confidentiality covenants, UBS has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation.

### THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duties – Against All Defendants)

119.    UBS repeats and realleges each and every allegation contained in Paragraphs 1 through 118 of the Complaint as if fully set forth herein.

120.    Each Defendant was employed by UBS in a position of trust and confidence.

121.    By virtue of his or her position at UBS, each Defendant owed a fiduciary duty and a duty of loyalty to UBS both during and after his or her employment and was obligated not to divert UBS's business in which it had a tangible expectancy, and not to subvert or misappropriate UBS's Confidential Information.

122.    Each Defendant breached his or her fiduciary duties owed to UBS by directly or indirectly soliciting and/or diverting UBS's clients and business opportunities, in which it had a tangible expectancy, to Morgan Stanley, a direct competitor, and/or subverting or misappropriating UBS's Confidential Information and Trade Secrets.

123.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. UBS will continue to suffer this harm unless and until Defendants are restrained from taking further actions in breach of their fiduciary duties to UBS.

124.    As a direct and proximate result of Defendants' breaches of their duties of loyalty, UBS has suffered and will continue to suffer additional damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

125.     Each Defendant committed his or her actions knowingly, willfully and in conscious disregard of UBS's rights. Accordingly, UBS is entitled to recover actual and exemplary damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**(Tortious Interference with Existing and Prospective Business Relationships – Against All Defendants)**

126.     UBS repeats and realleges each and every allegation contained in Paragraphs 1 through 125 of the Complaint as if fully set forth herein.

127.     As a result of their employment with UBS, Defendants were intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between UBS and certain clients.

128.     The Defendants intentionally, with malice, and without privilege or justification, interfered with UBS's business relationships with certain clients using unfair or improper means, and/or with the intent to interfere with such relationships.

129.     UBS possesses a protectable interest in its contracts and relations with its clients, in that it has a reasonable expectation of their continued association with UBS.

130.     Defendants' conduct was undertaken with malice, or in knowing disregard of or indifference to, the rights and interests of UBS.

131.     As a direct and proximate result of Defendants' interference, jointly and severally, UBS suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

132.     UBS will suffer this harm unless and until Defendants' are restrained from their respective current and intended conduct.

133.    As a direct and proximate result of Defendants' interference, jointly and severally, UBS suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Misappropriation of Confidential Information - Against All Defendants)

134.    UBS repeats and realleges each and every allegation contained in Paragraphs 1 through 133 of the Complaint as if fully set forth herein.

135.    As senior employees of UBS, each Defendant learned or had access to UBS's Confidential Information.

136.    Upon information and belief, each Defendant has used or disclosed, or threatens to use or disclose, UBS's Confidential Information.

137.    Upon information and belief, Defendants are presently misappropriating UBS's Confidential Information, and using such information to the detriment of UBS.

138.    As a direct and proximate result of Defendants' conduct, jointly and severally, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  UBS will suffer this harm unless and until Defendants are restrained from their current and intended conduct.

## SIXTH CLAIM FOR RELIEF
### (Unfair Competition - Against All Defendants)

139.    UBS repeats and realleges each and every allegation contained in Paragraphs 1 through 138 of the Complaint as if fully set forth herein.

140.    Upon information and belief, Defendants engaged in unfair methods of competition in that they have unlawfully seized, appropriated and utilized unfair advantages in

their competition with UBS from each Defendant's breach of his or her non-solicitation and confidentiality Agreements; each Defendant's breach of his or her fiduciary duties; and Defendants' interference with UBS's business, advantages and prospective economic relations and contracts, all of which are more fully set forth above.

141.    As a direct and proximate result of Defendants' conduct, jointly and severally, UBS has been damaged in that, by way of illustration and without limitation: (1) the name, reputation and goodwill of UBS has been damaged; (2) a direct competitor has secured UBS's Confidential Information; (3) UBS has lost business, in an amount unable to be ascertained at this time; and (4) the damages suffered by UBS is expected to continue and multiply by reason of ongoing breaches by Defendants.

142.    As a direct and proximate result of Defendants' conduct, jointly and severally, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to their business, and other injury and damages for which there is no adequate remedy at law.

143.    UBS will suffer this harm unless and until Defendants are restrained from their current and intended conduct.

144.    As a direct and proximate result of Defendants' unlawful competition, jointly and severally, UBS has suffered and will continue to suffer damages, which continue to accrue in the form of attorneys' fees and costs related to this litigation, and lost business in an amount to be proven at trial.

**WHEREFORE**, UBS demands judgment for preliminary injunctive relief, pending FINRA arbitration, as follows:

A.    Enjoining and restraining Defendants, and any person or entity acting in concert with them or under their supervision, through December 4, 2021, and as extended during any

period that Defendants have breached their obligations to UBS, from directly or indirectly soliciting or influencing any of UBS's clients or client relationships that each Defendant either performed work for, supervised or actively solicited work from during the twelve months prior to the date on which each Defendant resigned their UBS employment;

B.      Enjoining and restraining Defendants, and any person or entity acting in concert with them or under their supervision, from possessing, using, disclosing or disseminating UBS's Confidential Information;

C.      Enjoining Defendants, and any person or entity acting in concert with them or under their supervision, from any other actions in violation of any Individual Defendant's contractual obligations or fiduciary duties owed to UBS;

D.      Awarding compensatory damages and interest to UBS in an amount to be determined by a panel of FINRA arbitrators;

E.      Awarding exemplary and punitive damages in an amount to be determined by a panel of FINRA arbitrators; and

F.      Granting UBS its costs and disbursements incurred in connection with this litigation, including attorneys' fees, together with such other further relief as the Court may deem just and proper.

**Dated**: December 10, 2020.                    Respectfully submitted,

/s/ *Sherril M. Colombo*
Sherril M. Colombo
LITTLER MENDELSON, P.C.
Wells Fargo Center
333 SE Second Avenue, Suite 2700
Miami, FL 33131
(305) 400-7500
scolombo@littler.com

Shawn Matthew Clark
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
(212) 583-9600
SMClark@littler.com

*Attorneys for Plaintiff*